Giselle JONES, Plaintiff,

v.

**Donna TANOUE, in her capacity as Chairman, Federal Deposit Insurance Corporation, Defendant.**

**No. Civ.A. 00–00930 (ESH).**

United States District Court, District of Columbia.

Feb. 16, 2001.

Janet A. Vecchia, Washington, DC, for Plaintiff.

Kirk K. Van Tine, Kelly R. Donovan, Baker Botts LLP, Washington, DC, Thomas J. Sarisky, Federal Deposit Insurance Corp., Washington, DC, for Defendant.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Before the Court is defendant's motion for summary judgment, plaintiff's opposition and defendant's reply. Plaintiff Giselle Jones, an African–American female, began her employment with the Federal Deposit Insurance Corporation ("FDIC") in 1993, as a term employee in the Division of Finance ("DOF"). On June 10, 1996, plaintiff applied for a permanent Supervisory Travel Policy Specialist position in the DOF. Plaintiff was interviewed and, according to plaintiff, she was advised that her selection for the job was contingent on her conversion to a permanent position

being approved. Plaintiff's conversion was not approved and plaintiff was not selected for the position. That position was not filled, the vacancy announcement was canceled, and a similar announcement was subsequently posted for permanent employee applicants only. Plaintiff alleges that she was not selected because of racial discrimination. Defendant contends that plaintiff has failed to establish a prima facie case of discriminatory non-selection because the position did not remain open and was not filled by a person outside plaintiff's protected class. For the reasons explained more fully below, the Court finds that based on the undisputed evidence, plaintiff cannot establish a prima facie case, and therefore, summary judgment is granted.

## BACKGROUND

Plaintiff began her employment at FDIC in July 1993 as a Grade 11 term employee in DOF. (Def.St.¶ 1.) Plaintiff applied for a permanent Supervisory Travel Policy Specialist position in the DOF in June 1996. (Def.St.¶ 2.) Plaintiff contends that after her interview for the position with Edgar Bolick, he told that she was his choice for the job, but that her selection was contingent on her conversion to a permanent position being approved. (Pl.St.¶ 4.) Plaintiff contends that Bolick said he did not anticipate that her conversion would be a problem. (*Id.*) Plaintiff's conversion was not approved and plaintiff was not selected for the position. Defendant contends that the request for approval of plaintiff's conversion was withdrawn after Thomas Peddicord determined that it would be inconsistent with both current and proposed core staffing levels. (Pl.St. ¶ 13; Def.Ex. 3.) The position was not filled and the vacancy announcement was canceled. (Def.St.¶ 3.)[1] Defendant claims that the position was mistakenly posted as being available to both term/temporary and permanent employees, because the core staffing levels in place at that time did not permit the conversion of a term or temporary employee to a permanent employee. Plaintiff contends that the core staffing levels would have supported her conversion to a permanent position at that time, and that a conversion was denied because of her race. After the cancellation of the vacancy announcement, a similar position, Supervisory Travel Audit Specialist, was posted for permanent employees only. (Pl.St.¶ 9.) This position was ultimately filled by an African–American woman. (Def.Ex.8.)

## LEGAL ANALYSIS

### I. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987); *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

---

1. While plaintiff was at one point informed that a different applicant had been selected for the position (Pl.Ex.23), she does not dispute that in fact the position was not filled and was canceled. (Pl.St.¶ 8.)

## II. Discrimination

█ In order to state a prima facie case of discriminatory non-selection under Title VII, plaintiff must establish that: (1) plaintiff is a member of a protected class; (2) she applied for and was qualified for an available position; (3) she was not selected; and (4) either someone not of his protected class filled the position or the position remained vacant and the employer continued to seek applicants. *Cones v. Shalala,* 199 F.3d 512, 516 (D.C.Cir.2000). It is undisputed that plaintiff is a member of a protected class and that she was not selected for the permanent Supervisory Travel Policy Specialist position for which she applied.[2]

█ Defendant argues that plaintiff cannot establish the fourth prong of the prima facie case because the position for which plaintiff applied was canceled. It is therefore undisputed that this position was neither filled by an individual outside the protected class nor remained open while defendants continued to receive applications. Given these undisputed facts, plaintiff cannot establish a prima facie case of discriminatory non-selection. *Carter v. Pena,* 14 F .Supp.2d 1, 6 (D.D.C.1997) ("Because the DOE canceled the vacancy announcements at issue, the position did not remain open, and Carter cannot meet the fourth requirement of the [prima facie case]."), *aff'd,* 1998 WL 315616 (D.C.Cir. April 8, 1998).[3] After the cancellation, a similar position was posted, open only to permanent employee applicants. (Pl.St.

¶ 9.) As a term employee, plaintiff did not qualify, and did not apply, for this position. While plaintiff argues that this second position was first offered to a white female, it is undisputed that the position was ultimately filled by an African–American female. (Pl.St. ¶ 10; Def.Ex. 8.)

Moreover, plaintiff has presented no evidence that the vacancy announcement for the position was canceled for a discriminatory reason. Plaintiff argues that because she could have been converted to a permanent position consistent with the core staffing levels, one should infer that the vacancy announcement was canceled because of her race. The undisputed evidence undermines any such inference, since the core staffing levels would not have permitted her conversion to a permanent position. On February 27, 1996, Dennis Geer, Chief Operating Officer of the FDIC, sent a memo to all division directors instructing that:

> As employees are selected to fill both permanent and term/temporary positions in your organization, you are responsible for ensuring that these selections do not result in your organization exceeding its approved core staffing levels (for permanent staff) or its approved staffing levels for year-end 1996 (for total staffing). In particular, if your permanent workforce currently equals or exceeds your approved core staffing levels (by location, grade and position type), you should not fill vacancies with permanent appointees.[4]

---

2. Defendants also contend that plaintiff was not qualified for the position because she was a term employee and the position should only have been posted for permanent employees. The Court finds that this argument is more properly considered as defendant's proffered non-discriminatory reason for not selecting her. However, because the Court finds that plaintiff has failed to establish a prima facie case, under the three-part burden shifting test established by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Court does not reach this issue or plaintiff's arguments relating to pretext.

3. Plaintiff admits that she was informed that the vacancy announcement for the position was canceled because it had been sent in error to both permanent and non-permanent employees, when it should have been sent only to permanent employees. Complaint ¶ 17.

4. A "permanent appointee" is a nonpermanent employee or an outside hire selected to fill a permanent position. Def.Mot. at 2 n. 4.

(Pl.Ex.5.) Under the core staffing levels in effect in August 1996, "Core 1," DOF headquarters was permitted a total of 158 permanent staff, including 18 staff for the travel/relocation function. (Pl.Ex. 3; Def. Reply Ex. 2 (Peddicord Dep. at 93–94).) As of July 6, 1996, there were 321 permanent employees at DOF headquarters, which exceeded the approved core staffing level by 163 employees. (Def.St. ¶ 6; Def. Ex. 3.) DOF operated under these core staffing levels until December 1996. (Def. Reply Ex. 2 (Peddicord Dep. at 104–07).) Therefore, the approved core staffing levels in effect did not permit the conversion of plaintiff from a term position to a permanent position. (*Id.;* Def.Ex. 3.)[5]

Moreover, plaintiff's conversion to a permanent position would not have been permitted under the "Core 2" levels even if they had been in effect, which they were not. Core 2 levels were proposed in August 1996, and approved in December 1996, and set year-end and mid-year staffing levels for 1996–1999 and 2000 core staffing levels. (Def.Ex. 3; Def. Reply Ex. 2 (Peddicord Dep. at 93).)[6] The proposed Core 2 levels anticipated a work load that would sustain 45 supervisors/managers from Grade 12–15 at DOF Headquarters at year-end 1996. (Def.Ex.3.) In August 1996 there were 43 permanent supervisors/managers from Grade 12–15, and one temporary or term supervisor. (*Id.;* Def.

Reply Ex. 2 (Peddicord Dep. at 96–101).) Plaintiff argues that one vacancy existed for a permanent supervisory position, and therefore, she could have been converted. (*See* Pl.St. ¶ 18.) However, none of the evidence cited by plaintiff supports her assertion that the vacancy that existed in 1996 under the proposed Core 2 levels was for a permanent position.

Under proposed Core 2 levels, DOF Headquarters was allotted 39 supervisors/managers from Grade 12–15 to perform its workload as of June 30, 1997. (Def.Ex.3.) The number of current supervisory employees (44) therefore exceeded the short-term projected staffing requirement by five employees. (*Id.;* Def. Reply Ex. 2 (Peddicord Dep. at 99–101).) The long-term requirement, projected for 2000, was for only 28 supervisors. (Def.Ex. 3; Def. Reply Ex. 2 (Peddicord Dep. at 99–101).) This was the requirement relevant to permanent hires. (Def. Reply Ex. 2 (Peddicord Dep. at 80, 101–03).) Therefore, while Core 2 levels proposed for 1996–2000 would permit one additional supervisory employee through June 30, 1997, they would not permit any additional permanent employees because the current number of permanent supervisory employees (43) exceeded the long-term core staffing level of 28. (Def. Reply Ex. 2 (Peddicord Dep. at 97–104).)[7] Therefore, Core 2

5. Plaintiff offers no evidence that Core 1 permitted her conversion to a permanent position. Plaintiff instead argues that under Core 2, which was not in effect at the time her conversion was denied, there was a vacancy.

6. On August 5, 1996, Thomas Peddicord, Associate Director for Management Review, received the DOF's request for approval of plaintiff's conversion. (Def.Ex.3.) While only the Core 1 staffing levels were approved and in effect at the time plaintiff's conversion was considered, Peddicord also reviewed plaintiff's proposed conversion under the Core 2 staffing levels, which had been proposed but were not yet approved and not effective, to see if they would yield a different result. (Def. Reply Ex. 2 (Peddicord Dep. 70–71).) As discussed above, he concluded that Core 2 did not permit plaintiff's conversion either. (*See* Def.Ex. 3.) After Peddicord informed

Fred Selby, who was Deputy Director of the DOF for Resource Management, that core staffing levels did not support the conversion and asked whether he could provide any further justification for the conversion, the request for approval was withdrawn. (*Id.*)

7. In addition, the travel function was included in the Resource Management organization core staffing levels, which projected a 2000 core staffing level of 130 total employees, including 13 Grade 12–15 supervisors. (Def.Ex.3.) In 1996, there were 137 permanent employees and 19 supervisors. (*Id.*) As there was a projected surplus of 6 supervisors under core staffing levels, there were no available permanent positions. (*Id.;* Def.St. ¶ 6.) Similarly, while the August 2, 1996 DOF Staffing estimates noted two available supervisory vacancies, the vacancies only existed

levels, even if they had been in effect, only supported the appointment of plaintiff in the travel specialist position as a term employee for 6 months or through June 30, 1997, not as a permanent employee. (*Id.*) [8] Because neither Core 1 or Core 2 levels supported plaintiff's conversion to a permanent position, the cancellation of the vacancy announcement and the reposting of the position for permanent employees do not raise an inference of discrimination.

Plaintiff also argues that she could have been converted as an exception to the core staffing levels, and that similarly situated white employees were granted conversions. Again, this argument is not supported by the evidence. To be considered " 'similarly situated,' the individuals with whom the plaintiff seeks to compare [ ]her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Phillips v. Holladay Property Servs.*, 937 F.Supp. 32, 37 (D.D.C.1996), *aff'd without op.*, 1997 WL 411695 (D.C.Cir. Jun 19, 1997) (citations omitted); *see also Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.Cir.1999) ("A plaintiff must ... demonstrate that all of the relevant aspects of her employment situation were nearly identical to those" of the comparators) (citation omitted). Plaintiff argues that 329 employees throughout FDIC, including 23 African–Americans, were converted to permanent positions from January 1, 1996 to March 31, 1997. (Pl.Ex. 27; Pl.Ex. 31.) Plaintiff has made no showing that any of these employees were similarly situated or even that any of the conversions were inconsistent with core staffing levels and were granted as exceptions.[9]

Plaintiff cites as similarly situated three white employees who worked in the Dallas field office finance center and were converted to permanent positions in early May 1996.[10] The conversions were approved by James Thompson, the Director of the Field Finance Centers, who also worked in the Dallas field office. (Def. Reply Ex. 5 (Selby Dep. 17–21).) Plaintiff argues that because in 1996 there was a department at DOF headquarters that oversaw field operations, the three employees in the Dallas field office were in fact part of DOF headquarters in Washington D.C.[11] While plaintiff cites no evidence that these employees in the Dallas field

---

8. Plaintiff also cites the testimony of Geer and Selby to support her assertion that the vacancy was for a permanent position. Geer testified that in 1996 there was one more supervisory position, not that the position could be filled permanently or that the vacancy was projected beyond 1996. (Def. Reply Ex. 3 (Geer Dep. at 161).) Selby testified that while there was one vacancy at the end of 1996, by July 1997 there would be a surplus of 5 supervisors, and by 2000, an additional surplus of 11 supervisors (for a total of 16 supervisors in excess of the core staffing level). (Def. Reply Ex. 5 (Selby Dep. at 161–64).) This testimony refutes plaintiff's unsupported assertion that the vacancy was a permanent vacancy. (*See* Pl.St. ¶¶ 15, 18, 19, 20, 22.) Moreover, plaintiff's assertion that Geer authorized divisions

until June 30, 1997, when a surplus of 4 supervisory employees was projected. (Pl. Ex.15.) Therefore, these vacancies would support a term appointment, but not a permanent appointment.

to fill vacancies with term employees is directly refuted by the documents she cites, which make clear that term employees can be appointed permanently only if it is consistent with core staffing levels. (*See* Pl.St. ¶ 20.)

9. Plaintiff argues that in 1996, Geer was required to approve all conversions but did not approve the 329 conversions throughout FDIC. Defendant contends that Geer was not required to approve all conversions, only conversions that were inconsistent with core staffing levels and therefore required exceptions. This dispute is not material, as it has no bearing on whether any of the alleged comparators were similarly situated.

10. These were the only DOF employees who converted in 1996. (Pl.Ex.27.).

11. Defendant contends that these employees of the Dallas field office were not considered employees of headquarters.

office were considered employees of DOF headquarters, even if they were, this fact alone is insufficient to establish that they were similarly situated to plaintiff. There is no evidence that their positions, grades, and supervisors were the same as plaintiff. Moreover there is no evidence about the circumstances of their conversions to support a claim of similarity to plaintiff's situation. Indeed, their conversions were considered by a different supervisor, in a different office, under different core staffing levels. (*See* Pl.Ex. 3; Def. Reply Ex. 5 (Selby Dep. 17–21).) There is no evidence that their conversions were inconsistent with core staffing levels, or that if they were, exceptions were granted under circumstances that show disparate treatment of plaintiff. Therefore, the Court finds that there is no evidence of discrimination in the cancellation and reposting of the position that would enable plaintiff to establish a prima facie case.

## CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiff has failed to establish a prima facie case of race discrimination. Accordingly, defendant's motion for summary judgment is granted.